J-A28030-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| PHILADELPHIA CORPORATION FOR AGING | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERTA KNOX | : | |
| ----------------------------------------- | : | No. 312 EDA 2022 |
| PHILADELPHIA CORPORATION FOR AGING | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GERALDINE GERR | : | |
| | : | |
| | : | |
| APPEAL OF: JACINTH ROBERTS | : | |

Appeal from the Order Dated December 20, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 191203044,
191203045

| | | |
|---|---|---|
| PHILADELPHIA CORPORATION FOR AGING | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERTA KNOX | : | |
| ----------------------------------------- | : | No. 314 EDA 2022 |
| PHILADELPHIA CORPORATION FOR AGING | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GERALDINE GERR | : | |

J-A28030-22

:
:
:
APPEAL OF: JACINTH ROBERTS    :

Appeal from the Order Dated December 20, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  191203044,
191203045

BEFORE:  PANELLA, P.J., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, J.:       **FILED APRIL 18, 2023**

Jacinth Roberts appeals from the order, entered in the Court of Common Pleas of Philadelphia County, finding her in contempt and imposing monetary sanctions.[1]  Upon review, we affirm.

In December of 2019, the Philadelphia Corporation for Aging (PCA) initiated the above-captioned actions on an emergency basis, seeking information regarding the whereabouts, health, and well-being of Roberta Knox and Geraldine Gerr, who resided at Roberts' home.[2]  Following hearings, the trial court issued several orders that required Roberts to cooperate with PCA's investigation by, *inter alia*, providing PCA access to her home for the purpose of interviewing Knox and Gerr, and enjoining Roberts from interfering with PCA's investigation.

_____

[1] Roberts filed two separate notices of appeal from the trial court's order, one at each of the above-captioned dockets, in compliance with ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018).  On April 5, 2022, this Court consolidated Roberts' appeals *sua sponte*.  ***See*** Pa.R.A.P. 513.

[2] These matters were both originally before the Honorable Edward Wright. However, the matters were later transferred to the Honorable Joshua Roberts. We refer to both jurists as "trial court" throughout this memorandum.

- 2 -

In May of 2020, PCA filed a motion seeking additional relief, alleging that Roberts was no longer permitting PCA to access her home to speak with Knox and Gerr, and that Roberts was in total noncompliance with the trial court's orders. After administrative delays due to the COVID-19 pandemic, the trial court issued an order, in both cases, that reaffirmed Roberts' obligations pursuant to the prior orders. Additionally, the trial court ordered Roberts be deposed, within 30 days, so that PCA could question Roberts under oath on the whereabouts, health, and safety of Gerr and Knox.[3]

On May 26, 2021, PCA filed a petition for contempt, contending that Roberts had failed to comply with all prior court orders. On July 20, 2021, the trial court conducted a remote hearing, via Zoom, for which Roberts did not appear. The trial court issued a civil bench warrant directing the sheriff to take Roberts into custody and bring her to court on August 6, 2021. On August 6, 2021, Roberts was brought before the trial court for a contempt hearing. Ultimately, the trial court required Roberts to appear for the depositions that were previously ordered, and scheduled an additional contempt hearing.

_____

[3] At this time, for reasons unknown to this Court, the above-captioned cases were not consolidated and the case involving Gerr was proceeding more quickly. Nevertheless, after a hearing in the Knox matter in February of 2021, the trial court issued a virtually identical order to the order in the Gerr matter.

On April 1, 2021, the cases were consolidated and all further action from the trial court applied to both matters.

The trial court conducted the contempt hearing over three days, on August 30, 2021, September 17, 2021, and September 28, 2021. After considering the testimony, evidence, and arguments from both parties, the trial court entered an order holding Roberts in contempt and directing PCA to file a fee petition. *See* Order, 10/4/21. PCA complied, and Roberts filed a response. Subsequently, the trial court entered an order directing Roberts to "reimburse PCA the amount of $53,679.32, representing the fees and costs PCA had to incur as a result of Roberts' contumacious conduct." Trial Court Opinion, 4/27/22, at 7.

Roberts filed these timely appeals and court-ordered Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal.

Roberts now raises the following issues:

1. When the purpose of civil contempt is to coerce compliance with a court's order, should a [t]rial [c]ourt grant a petition for contempt even after the respondent has fully complied with the order?

2. When a [t]rial [c]ourt sends orders to an address where respondent no longer receives mail and respondent does not open letters from a business entity that she finds morally offensive, should a [t]rial [c]ourt find that respondent received notice of and intentionally violated a court order?

3. When a petitioner already has the information sought by a court order and is permitted to serve by alternative service the order requiring compliance[,] should a [t]rial [c]ourt find that petitioner has suffered damages because of petitioner's efforts to effect personal service of process?

4. Should a [t]rial [c]ourt summarily grant attorney's fees without a hearing on the evidentiary issues regarding the need for the

- 4 -

work performed, the reasonableness of the rates charged, and the respondent's ability to pay?

Brief for Appellant, at 4.

Preliminarily, we must address whether Roberts' claims are properly preserved for our review. We note that all of Roberts' claims in her Statement of Questions Involved are phrased as general policy questions. It is well-settled that this Court is an error-correcting court that leaves questions of policy to the Supreme Court and the General Assembly. *See Z.F.1 by and through Parent v. Bethanna*, 244 A.3d 282, 494 (Pa. Super. 2020) ("it is not the institutional role of the Superior Court to make [] policy decisions") (citing *Matter of M.P.*, 204 A.3d 976, 986 (Pa. Super. 2019)). Moreover, none of these policy questions was raised before the trial court and, therefore, are waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived."). Furthermore, none of these questions is presented in Roberts' argument section of her appellate brief and, thus, are waived on this basis as well. *See* Pa.R.A.P. 2116(a) (requiring statement of questions involved include all issues to be resolved on appeal); Pa.R.A.P. 2119(a) (requiring argument section be divided into as many parts as there are questions to be argued); *see also Commonwealth v. Fremd*, 860 A.2d 515, 523-24 (Pa. Super. 2004) (failure to raise argument issue in statement of questions involved results in waiver).

Nevertheless, Roberts' argument section contains her challenge to whether or not she received notice of the trial court's various orders. This claim was addressed by the trial court in its opinion, and it was similarly

preserved in Roberts' Rule 1925(b) concise statement. We agree with the trial court, and, therefore, affirm its order and rely upon its well-reasoned opinion.

As the trial court painstakingly detailed in its opinion, Roberts was provided notice by two process servers over the course of approximately 18 months, one of whom identified Roberts in court as the woman who received the court papers. *See* Trial Court Opinion, 4/27/22, at 9-10 (process server identified Roberts in court; both process servers testified that Roberts would remove posted court notices from property before process servers left property, presented pictures of service into evidence, and testified Roberts threw court papers in trash); *id.* at 10-13 (summarizing Roberts' testimony acknowledged that she received all court papers but ignored them because "she does not like PCA"; Roberts does not read mail or papers addressed to her from PCA; Roberts' refusal to open court papers continued after sheriff brought Roberts to August 6, 2020 hearing; Roberts blocked PCA and outside counsel telephone numbers; and Roberts testified she refused to open emails from PCA). Moreover, the trial court found Roberts to be completely lacking in credibility. *See id.* at 11, 13-14. Finally, to the extent that Roberts "complied" with any of the court orders, it is clear that Roberts has volitionally ignored five court orders, including a sanction order, and the only "compliance" was involuntary due to the sheriff taking her into custody. *See id.* at 4-8, 9-10 (detailing Roberts' contumacious behavior). Thus, Roberts' revisionist history of the record warrants no relief, and we affirm the trial court's order on the basis of its well-reasoned and thorough opinion. The

parties are directed to attach a copy of that opinion in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/18/2023

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| PHILADELPHIA CORPORATION FOR AGING | : Superior Court Docket: |
| | : |
| | : 314 EDA 2022 |
| Petitioner | : |
| | : Trial Court Docket: |
| v. | : |
| | : December Term 2019 |
| ROBERTA KNOX, ET AL | : No. 3045 |
| | : |
| Respondents | : |
| | : |
| PHILADELPHIA CORPORATION FOR AGING | : Superior Court Docket: |
| | : |
| | : 312 EDA 2022 |
| Petitioner | : |
| | : Trial Court Docket: |
| v. | : |
| | : December Term 2019 |
| GERALDINE GERR, ET AL | : No. 3044 |
| | : |
| Respondents | : |
| | : |

OPFLD-Philadelphia Corporation For Aging Vs Gerr Etal



19120304400061

**1925(a) OPINION**

    The Philadelphia Corporation for Aging has a statutory authorization to investigate potential abuse of elderly citizens. PCA, in furtherance of that authority, instituted these consolidated actions on an emergency basis in December 2019, seeking information regarding the whereabouts, health, and well-being of Roberta Knox and Geraldine Gerr. Based on PCA's then-best information, both Ms. Knox and Ms. Gerr resided with Jacinth Roberts at a property owned and/or managed by Ms. Roberts.

PCA obtained court orders authorizing it to conduct investigations into both Ms. Knox and Ms. Gerr. After an initial visit by PCA to Ms. Roberts's house, Ms. Roberts ignored all subsequent attempts by PCA to obtain information and continue its investigations. This included Ms. Roberts ignoring numerous court orders. It was not until this Court issued a bench warrant and the sheriff physically brought Ms. Roberts before this Court that PCA was able to continue and complete its investigation.

As a result of Ms. Roberts's obdurate and obstructionist conduct, PCA incurred substantial attorneys' fees and costs it otherwise would not have incurred had Ms. Roberts cooperated and complied with court orders. This Court, after conducting a contempt hearing, issued an Order finding Ms. Roberts in contempt of numerous court orders. PCA filed a motion for attorneys' fees that it claims it incurred as a result of Ms. Roberts's contumacious conduct. Ms. Roberts filed a response. This Court then issued an Order imposing a monetary sanction upon Ms. Roberts representing the fees and costs PCA incurred as a result of Ms. Roberts's repeated violations of court orders and the additional fees and costs PCA had to spend to conduct its investigations into Ms. Knox and Ms. Gerr, in fulfillment of its statutory authority.

Ms. Roberts has now filed this timely appeal. On appeal, Ms. Roberts raises *inter alia* the following issues: (1) this Court erred in finding Ms. Roberts in contempt and/or in violation of prior orders of this Court and other judges of equal jurisdiction; (2) this Court erred in sanctioning Ms. Roberts for her contumacious

2

conduct; (3) this Court did not issue findings of fact and conclusions of law, and did not require the parties to submit proposed findings of fact and conclusions of law; (4) the counsel fee award to PCA is excessive; (5) this Court's calculation of counsel fees was in error; (6) this Court did not conduct an evidentiary hearing on PCA's fee petition; and (7) this Court's credibility determinations regarding Ms. Roberts were against the weight of the evidence.

This Court properly concluded that Ms. Roberts intentionally ignored and obstructed PCA's efforts to learn information about Ms. Knox and Ms. Gerr. Ms. Roberts was not free to disregard court orders and thumb her nose at the Court's authority as PCA exercised its statutory authority to seek protection for Ms. Knox and Ms. Gerr. Ms. Roberts's own conduct led to this Court's imposition of the monetary sanctions for contempt.

Thus, for the reasons set forth below, the Superior Court should affirm this Court's Order imposing sanctions against Ms. Roberts for civil contempt.

## A.     Philadelphia Corporation On Aging's Statutory Authority

The Philadelphia Corporation on Aging, through a statutory designation by the Pennsylvania Department of Aging, is the Philadelphia provider of older adult protective services. 35 P.S. § 10225.302; 6 Pa. Code § 30.1 (Appendix A). Pursuant to the statutory framework, any person who has reasonable cause to believe that an older adult who is in Philadelphia is in need of protective services may file a report with PCA. 35 P.S. § 10225.302. PCA has a responsibility to investigate each report it receives within 72 hours of receipt of the report. 35 P.S. §§ 10225.302, 10225.303.

3

PCA must be permitted access to the older adult to conduct an assessment, provide services, if necessary, and develop an action plan to prevent further abuse and/or neglect. 35 P.S. § 10225.304. If PCA is denied access to the older adult, or a caretaker interferes with PCA's investigation, PCA may seek a court order requiring a caretaker to provide access and/or cease interfering. 35 P.S. § 10225.304. The agency shall have access to older persons who have been reported to be in need of protective services in order to: (i) investigate reports under section 303; and (ii) assess client need and develop a service plan for addressing needs determined. 35 P.S. § 10225.304(e).

A caretaker is as any individual or institution that has assumed the responsibility for the of care needed to maintain the physical or mental health of an older adult. This responsibility may arise voluntarily, by contract, by receipt of payment for care, by family relationship, or by order of a court of competent jurisdiction. 35 P.S. § 10225.103.

## B.    Factual and Procedural Background of Appeal

By the time this Court became involved in these matters, PCA had already sought and received court orders from the Honorable Edward Wright requiring Ms. Roberts to cooperate with PCA's investigation. This initial orders are the foundation for Mr. Roberts's noncompliance that followed.

PCA initially filed its petitions for relief on December 20, 2019, seeking information on Ms. Knox and Ms. Gerr, both believed to be living with Ms. Roberts at 5709 N. Park Avenue in Philadelphia, and to enjoin Ms. Roberts from interfering

4

with PCA's investigation. Ms. Roberts has owned the property for over 50 years, according to Philadelphia property records. Following a hearing, Judge Wright granted PCA's request, *inter alia* ordering Ms. Roberts to provide PCA access to her home for the purpose of interviewing Ms. Knox and Ms. Gerr, and enjoining Ms. Roberts from interfering with PCA's investigation.

On May 27, 2020, PCA filed a motion seeking additional relief, based on information it had learned since December 2019. In sum, PCA had discovered that Ms. Roberts had filed for bankruptcy protection (the bankruptcy had been discharged in May 2020), and Ms. Roberts, after initially allowing PCA access to her home, had subsequently refused to provide PCA with any of the information it sought.

Up until this point, the Knox and Gerr matters had been treated similarly and operated on the same timetable. As a result of the Covid-19 pandemic, and/or for reasons unknown to this Court, the Gerr matter proceeded in October 2020, while the Knox matter was delayed.

On October 30, 2020, Judge Wright entered an order, following a hearing, reaffirming Ms. Roberts's obligations pursuant to his prior order, and ordering Ms. Roberts to sit for a deposition within 30 days to allow PCA an opportunity to question Ms. Roberts under oath on the whereabouts, health, and safety of Ms. Gerr. On December 16, 2020, Judge Wright entered an Order sanctioning Ms. Roberts in the amount of $1,684.73 for her failure to appear for the deposition, and $100.00 for her failure to otherwise comply with the prior order.

Eventually, this Court held a hearing on February 2, 2021 in the Knox matter, at which PCA presented evidence of Ms. Roberts's noncompliance with Judge Wright's prior order with respect to Ms. Knox. Ms. Roberts did not appear for the hearing. As a result, this Court entered an Order docketed on February 8, 2021, *inter alia* reaffirming Ms. Roberts's obligations pursuant to Judge Wright's Order and ordering Ms. Roberts to sit for a deposition within 30 days to allow PCA an opportunity to question Ms. Roberts under oath on the whereabouts, health, and safety of Ms. Knox.

On April 1, 2021, the Gerr and Knox matters were consolidated, and all subsequent actions this Court took applied to both cases.

On May 26, 2021, PCA filed a Petition for Contempt, contending that Ms. Roberts had failed to comply with any prior court orders. This Court scheduled a rule hearing for July 20, 2021 via Zoom. Ms. Roberts did not appear at the contempt hearing. As a result, this Court issued a civil bench warrant directing the sheriff to take Ms. Roberts into custody and bring her to court on August 6, 2021. On August 6, 2021, the sheriff brought Ms. Roberts before this Court. At that hearing, this Court required Ms. Roberts to appear for the deposition requested by PCA, and this Court scheduled a further contempt hearing for August 30, 2021. On August 30, 2021, September 17, 2021, and September 28, 2021, this Court, via Zoom, heard testimony, evidence and argument on PCA's contempt petition.

On October 4, 2021, this Court entered an Order holding Ms. Roberts in contempt and requiring PCA to file a fee petition. After this Court reviewed the fee

petition, Ms. Roberts's response, and the various sur-replies, this Court entered an Order directing Ms. Roberts to reimburse PCA the amount of $53,679.32, representing the fees and costs PCA had to incur as a result of Ms. Roberts's contumacious conduct.

On January 20, 2022, Ms. Roberts filed this timely Notice of Appeal.

## C.    Standard of Review

Appellate review of a finding of contempt is limited to whether the trial court abused its discretion. *Lachat v. Hinchcliffe*, 769 A.2d 481, 487 (Pa. Super. 2001).[1] The complaining party must show, by a preponderance of the evidence, that the contemnor violated a court order, and that the order was definite, clear and specific, such that there was no doubt or uncertainty as to the prohibited conduct. *Id.* at 488-89. The complaining party must likewise show that the contemnor (i) had notice of the order; (ii) acted intentionally; and (iii) with wrongful intent. *Id.* at 489.

The distinction between civil and criminal contempt is that civil contempt is coercive and/or compensatory, and criminal contempt is punitive.

> Attorneys' fees and other disbursements necessitated by the contemnor's noncompliance may be recovered by the aggrieved party in a civil contempt case. Because an award of counsel fees is intended to reimburse an innocent litigant for expenses made necessary by the conduct of an opponent, it is coercive and compensatory, and not punitive. Counsel fees are a proper element of a civil contempt order.

---

[1] An abuse of discretion occurs if this Court committed an error of law or this Court exercised its judgment in a manifestly unreasonable manner, or this Court's decision was the result of partiality, prejudice, bias or ill-will, as shown by evidence on the record. *Womer v. Hilliker*, 908 A.2d 269, 273 (Pa. 2006).

*Mrozek v. James*, 780 A.2d 670, 674 (Pa. Super. 2001).

Appellate review of a trial court's award of attorney's fees is limited to whether "the trial court palpably abused its discretion" in making the fee award. *Thunberg v. Strause*, 682 A.2d 295, 299 (Pa. Super. 1996).

## D.   The Contempt Hearing

At the contempt hearing, this Court heard testimony and received evidence presented by PCA and Ms. Roberts. As part of this Court's decision to hold Ms. Roberts in contempt and impose sanctions, this Court did not find Ms. Roberts to be remotely credible. This Court found PCA's witnesses to be credible. *See Gutteridge v. J3 Energy Group, Inc.*, 165 A.3d 908, 916 (Pa. Super. 2017) (stating in non-jury matter, trial court assesses credibility and resolves conflicts in evidence).

Kristin Ahmed is a supervisor with Philadelphia Corporation on Aging's Older Protective Services division. Tr. 8/30/2021 at 19:17-20:18. Ms. Ahmed was familiar with both the Knox and Gerr cases. *Id.* A PCA investigator and police first visited Ms. Roberts's residence in the Fall of 2019, after PCA had received a complaint regarding Ms. Knox and Ms. Gerr. Tr. 8/30/2021 at 31:17-32:13. Apparently, Ms. Roberts indicated that Ms. Gerr had lived with her previously, but did not live with her at that time. Tr. 8/30/2021 at 22:8-25:14. Ms. Roberts did not provide any forwarding information or any other information about Ms. Gerr. Ms. Ahmed and a lawyer at PCA followed up with Ms. Roberts on May 22, 2020 regarding Ms. Gerr. *Id.* Ms. Roberts provided some information about Ms. Gerr, and indicated that paperwork about Ms. Gerr was at Ms. Roberts's Center City

8

office. *Id.* Four days later, on May 26, 2020, Ms. Ahmed had a second telephone conversation with Ms. Roberts during which, according to Ms. Ahmed, Ms. Roberts stated that the previously referenced documents did not exist. *Id.* Mr. Roberts made a veiled threat toward both PCA and/or the judge who had signed the order allowing PCA to gain access to Ms. Gerr. *Id.*

Because PCA was not able to obtain any information from Ms. Roberts and/or receive information in a timely manner, the trail of information for Ms. Gerr went cold, and PCA was not able to fulfill its duty to provide services that Ms. Gerr may have required. Tr. 8/30/2021 at 27:21-29:7. In attempting to obtain this information and follow any leads, PCA had to incur investigative costs, attorney's fees, and court costs that it would not have otherwise incurred had Ms. Roberts simply provided the information she had. *Id.*

George Phillips, a process server, testified that he served papers at 5709 N. Park Avenue in Philadelphia on 8 occasions, the first time on December 4, 2020. Tr. Tr. 8/30/2021 at 53:1-54:21. On his first visit, according to Mr. Phillips, a black female confronted Mr. Phillips and told Mr. Phillips he was not allowed to post papers on the front door or her property. Tr. 8/30/2021 at 54:22-55:21. The black female did not identify herself to Mr. Phillips. *Id.* On the subsequent occasions, Mr. Phillips either posted papers to a gate in front of the house or some other visible location. Tr. 8/30/2021 at 58:25-59:20. On some of those subsequent occasions, Mr. Phillips observed the black female remove the papers from wherever Mr. Phillips had posted them. Tr. 8/30/2021 at 56:1-57:11; 58:25-59:20. On all of the occasions,

9

Mr. Phillips took a picture of the service. *Id.* While Mr. Phillips did not specifically identify Ms. Roberts as the black female he encountered and who removed the papers, the context from his testimony was quite clear that it was Ms. Roberts.

Milton Uricoechea is another process server who served papers at 5709 N. Park Avenue in Philadelphia on several occasions, commencing in May 2021. On May 27, 2021 at approximately 2:30pm, Mr. Uricoechea was serving papers at the property when he was confronted by Ms. Roberts. Tr. 8/30/2021 at 63:1-17. Mr. Uricoechea knew it was Ms. Roberts because she identified herself. *Id.* Mr. Uricoechea also identified Ms. Roberts during the Zoom hearing as the woman he encountered at the property. Tr. 8/30/2021 at 68:7-69:16. Mr. Uricoechea noted the head wrap Ms. Roberts wore at the time he saw her at the property. *Id.* She was wearing the same or similar head wrap during the hearing. *Id.*

Unlike Mr. Phillips, Mr. Uricoechea had conversations with Ms. Roberts when he served papers. Ms. Roberts told Mr. Uricoechea that she "didn't care" about the papers, that she would "throw them in the trash," and that the attorneys were "wasting [their] time." Tr. 8/30/2021 at 64:7-65:16.

The testimony of both Mr. Phillips and Mr. Uricoechea was credible, based on this Court's observation of their demeanor while testifying, their combined many years experience as process servers, and their corroborating, contemporaneous affidavits each prepared and filed. In sum, this Court concluded that both Mr. Phillips and Mr. Uricoechea had served Ms. Roberts with all of the various papers prepared by PCA and its attorneys, and all court orders during the course of this

litigation. Ms. Roberts herself confirmed, through her elusive and evasive testimony, that she received all of the court papers, but simply ignored them because she does not like PCA.

Ms. Roberts does not read mail or papers addressed to her from PCA. Tr. 9/17/2021 at 10:14-11:1. Ms. Roberts does not read any mail from anyone unless that person (or entity) spoke to Ms. Roberts first. Tr. 9/17/2021 at 14:8-16:10. Ms. Roberts never opened any of the envelopes that were served upon her by Mr. Phillips or Mr. Uricoechea (or by any other means). Tr. 9/17/2021 at 17:4-20:20. Even after this Court ordered the sheriff to bring Ms. Roberts to Court, and this Court held a contempt hearing, Ms. Roberts did not bother to open the envelopes that were being served on her by PCA (or its lawyers). *Id.*

Ms. Roberts also blocked PCA's telephone number and the telephone number of PCA's outside counsel, the law firm of Schnader Harrison. Tr. 9/17/2021 at 23:23-24:4. She ignored emails from PCA because, in her words, she had not "given them my email, so I'm not expecting an email from them." Tr. 9/17/2021 at 24:5-15. Ms. Roberts believes that all mail sent to 5709 N. Park Avenue in Philadelphia is "junk mail" because she has a post office box where she receives "non" junk mail. Tr. 9/17/2021 at 26:3-27:9.

Ms. Roberts also received mail at 1515 Market Street, Suite 1200 in Philadelphia, which she used as a business address. Tr. 9/17/2021 at 28:16-30:17. The Market Street address was the address used by PCA, and placed on the court's

docket, at the time PCA initiated this case in December 2019. Ms. Roberts confirmed that the address was valid at that time. Tr. 9/17/2021 at 31:3-12.

In all, Ms. Roberts insisted she did not receive a single piece of paper or court order served on her in these cases. This testimony is simply not credibile. Ms. Roberts lived at and owned her property for over 50 years. It is inconceivable that both Mr. Phillips and Mr. Uricoechea could recall details about service upon Ms. Roberts, but Ms. Roberts maintains that she did not receive any of the papers served upon her.

When questioned about Judge Wright's sanction order (which she never challenged through an appeal), Ms. Roberts brazenly contended that she "didn't believe [she] owed that money" because "PCA never actually spoke to me directly. They never said anything to me at all." Tr. 9/17/2021 at 54:20-57:11; 62:6-63:7.

Epitomizing Ms. Roberts's sheer lack of candor and evasiveness is a particular exchange during the hearing. Ms. Roberts avoided stating the obvious – that PCA had sent mail to her house – by engaging in her own version of an Abbott & Costello routine with counsel for PCA.

> Q.    Isn't it true that the postman delivers mail to your property?
> A.    Junk mail.
> Q.    But he delivers mail.
> A.    Junk mail, yes.
> Q.    Okay. You would characterize all the mail you receive at 5709 as junk mail?
> A.    Yes, because I have a P.O. Box. I don't get mail at my address.
> Q.    So if somebody sent you a letter at 5709 you just assume it's junk.

12

A.    I don't see the mail until – the mailman don't run
      until 8:00 at night so.
Q.    My question is: You just assume that anything you
      get at 5709 is junk.
A.    No.
Q.    You don't?
A.    No.
Q.    Do you look at the mail you get at 5709?
A.    When they bring it to me, I look at it.
Q.    Okay.  And not all of it is junk mail, correct?
A.    It's my kid's mail.
Q.    Do you consider mail from Philadelphia
      Corporation for Aging to be junk mail?
A.    If I get it, but I don't receive it.
Q.    You wouldn't read it anyway, would you?
A.    If they had spoken to me, yes.
Q.    Only if they speak to you, okay.  At your deposition,
      didn't you say that PCA had sent you, quote, a
      bunch of papers?
A.    Yeah.

Tr. 9/17/2021 at 26:3-27:9.

These responses illustrated for this Court that Ms. Roberts intentionally stymied PCA's efforts to learn information about Ms. Knox and Ms. Gerr.

Ms. Roberts justifies her lack of participation with PCA's investigation and her failure to comply with court orders because she does not like PCA's investigators.  Tr. 9/17/2021 at 69:2-70:15.  She believes that PCA investigators are liars, and they fabricate stories, and the court orders she disobeyed are the product of those lies and fabrications.  *Id.*  According to Ms. Roberts, PCA has improper influence with the court system, resulting in the orders she did not abide by.  *Id.* She also does not like that PCA is a non-profit organization.  Tr. 9/17/2021 at 65:23-67:13.

13

Ms. Roberts's "defense" to her noncompliance at the hearing was: (i) PCA investigators, after their initial visit in December 2019, told her everything was in compliance and the matter was over; (ii) no one from PCA ever spoke directly to Ms. Roberts about any subsequent issues; and (iii) Ms. Roberts was not aware of any subsequent court filings or court orders.

Upon consideration of the totality of the evidence, the facts, documents and the credibility of the witnesses, this Court concluded that PCA demonstrated by a preponderance of the evidence that Ms. Roberts (i) at all times had due process notice of these proceedings, including PCA's court filings and orders of court; (ii) violated the clear and specific instructions in the court orders; (iii) acted intentionally and with wrongful intent, due to her dislike of PCA. In connection with the finding of contempt, the Court ordered PCA to submit a fee petition.

## E.    PCA'S Fee Petition

Following the evidentiary hearing and oral argument, this Court entered an Order on October 4, 2021 granting PCA's petition and holding Ms. Roberts in contempt. The Order required PCA to submit a fee petition, setting forth the litigation fees and expenses it incurred as a result of Ms. Roberts's contumacious conduct. Ms. Roberts filed a response. On December 20, 2021, this Court issued an Order sanctioning Ms. Roberts in the amount of $53,679.32, representing the fees and costs PCA incurred as a result of her conduct.

A trial court's fee award will not be disturbed unless the appellate court finds that the trial court palpably abused its discretion. *Thunberg*, 682 A.2d at 299. If

the record supports a trial court's finding of fact, the award should stand. *Id.* "The award of attorneys fees is an appropriate remedy in a civil contempt case ... ." *Mrozek*, 780 A.2d at 674.

In reviewing PCA's fee petition, this Court considered the reasonableness of the time spent by counsel in the context of Ms. Roberts's conduct. *See Sutch v. Roxborough Mem. Hosp.*, 142 A.3d 38, 68-70 (Pa. Super. 2016). This Court was acutely aware of the case history, having reviewed the docket and listened to the testimony and evidence at the hearing. Ms. Roberts's course of conduct required PCA, first through in-house counsel and later through outside counsel, to spend countless extra hours and money seeking simply to carry out its statutorily permitted investigation and, later, to enforce orders of court. PCA only sought reimbursement for the fees incurred by outside counsel, Schnader Harrison Segal & Lewis LLP, from March 2021 through to September 2021. This Court carefully reviewed PCA's petition, considering the appropriate billing rates and time spent on the various activities.

According to Schnader Harrison's bills, filed in redacted form, the firm applied a 10% discount to all time it billed to PCA. The main attorney for PCA, Jonathan Hugg, Esq., billed at an hourly rate of $525/hour before the 10% discount. Mr. Hugg stated in an attached Certification that his normal billing rate during this time was $620/hour.

Mr. Hugg has been an attorney admitted to practice in Pennsylvania for over 25 years (admitted in December 5, 1994). The CLS fee schedule effective July 1,

15

2018 provides a range of rates for attorneys with 21-25 years of experience of $550-640 per hour. When the discount and reduction are factored in, Mr. Hugg's net hourly rate to PCA is $472.50. While the CLS schedule is not dispositive, the fee schedule is a reliable reference for lawyers who have prevailed in a public interest cause of action. *Carmen Enterprises, Inc. v. Murpenter, LLC*, 185 A.3d 380, 391 (Pa. Super. 2018). PCA is a public interest oriented non-profit organization. In sum, Mr. Hugg's hourly rate to PCA is eminently reasonable.

Mr. Hugg was the supervising attorney in this matter and devoted the overwhelming amount of time on the matter, of all the Schnader Harrison personnel. Various other Schander Harrison attorneys and legal professionals spent time on the case. This Court went through a similar analysis with each of those attorneys and legal professionals and concluded that the billing rates charged by Schnader Harrison fall within or below the CLS ranges.

Similarly, the Court went through each of Schnader Harrison's bills, line-by-line, to review the case activities. The Court compared those activities with the Court's own docket to determine whether the time spent on certain activities was reasonable in light of the then-procedural status of the case. The Court disallowed or reduced certain time and expenses as part of this process. But based on Ms. Roberts's repeated course of conduct, which this Court witnessed first hand during the hearing, Schander Harrison had to spend extensive time and resources devoted toward fulfilling PCA's statutory authority and effectuating orders of court.

16

In all, this Court awarded $53,679.32 in fees and costs, which is reasonable given the circumstances.

**F.      Conclusion**

For the foregoing reasons, this Court respectfully submits that the Superior Court should affirm this Court's Order finding Ms. Roberts in contempt and this Court's Order sanctioning Ms. Roberts.

BY THE COURT:

_____
Joshua Roberts, J.

Dated: April 27, 2022